```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
```

STEWART RHONE                                         CIVIL ACTION

VERSUS                                                NO. 14-233

CIGNA HEALTH MANAGEMENT, INC., ET AL.                 SECTION "B"(1)


                          ORDER AND REASONS


I.   NATURE OF MOTION AND RELIEF SOUGHT

    Before the Court is Defendants', Freedom Life Insurance Company of America ("Freedom Life") and USHealth Advisors, LLC ("USHealth"), Motion for Summary Judgment (Rec. Doc. 25), which seeks dismissal under Fed. R. Civ. P. 56 of Plaintiff's, Stewart Rhone (individually and as administrator of the estate of Rosalinda Rhone a/k/a Rosa Rhone), claims in this matter. Plaintiff opposes the motion, arguing issues of fact prevent summary judgment. (Rec. Doc. 35). For reasons that follow, **IT IS ORDERED THAT** Defendants' Motion is **GRANTED.**

II. FACTS AND PROCEDURAL HISTORY

    The undisputed material facts are as follows. Mrs. Rosa Rhone died in December 2012 at North Oaks Hospital due to complications from lupus disease. (Rec. Doc. 25-2 at 3; 35-1 at 2). She and her husband, the named plaintiff in this matter, had submitted an application for an Individual Specified Disease policy with Defendant Freedom Life on November 1, 2012. (Rec. 25-2 at 2; 35-1 at 1). On November 5, 2012, a Freedom Life

representative contacted the Rhones in order to have them repeat and verify the medical history information contained in the application. (Rec. Doc. 25-2 at 2; 35-1 at 1).

As part of both the application and subsequent telephone confirmation, neither of the Rhones made any mention of lupus or issues pertaining thereto. The record reflects that the coverage application included a series of medical history questions, which read, in pertinent part:

> Has any applicant been diagnosed with, treated or taken medications for, <u>consulted with, had symptoms of, or been advised to seek treatment for any disease or disorder of the:</u>
> . . .
> (j) Muscles, Joints, or Connective Tissues including but not limited to Rheumatism, Arthritis, Rheumatoid Arthritis, Gout, Fibromyalgia, Temporomandibular Joint disorder, (TMJ), Carpal Tunnel Syndrome, <u>Lupus</u> or Lyme disease?
> . . .
> (m) Skin including but not limited to Psoriasis or Eczema.

(Rec. Doc. 25-4 at 3)(emphasis added). Notations on the application indicate a negative response to both questions. *Id.* As well, notations on the Customer Service Call Script created by the Freedom Life representative at the time of the follow-up call indicate negative responses to the same questions when posed during that conversation. (Rec. Doc. 25-6 at 3 – 4).

A section of the Freedom Life application pertaining to Applicant Acknowledgments states:

2

> Acknowledge that any fraudulent statement or material misrepresentation on the Application and/or amendments may result in claim denial or contract rescission.
> . . .
> Acknowledge that there is a waiting period in both the SecureAdvantage sickness plan and the SecureAdvantage wellness plan before expenses incurred for the treatment of Pre-existing Conditions of any applicant will be eligible for a benefit payment under either plan (as described in applicable sections. . . .).

(Rec. Doc. 25-4 at 7). Within the Freedom Life policy itself, a section pertaining to Limitations-Waiting Periods, provides:

> Coverage under this Policy is limited as provided by the definitions, limitations, exclusions, and terms contained in each and every Section of this Policy, as well as the following limitations and waiting periods:
>
> Any treatment, medical service, surgery medication, equipment, claim, loss or expense received, purchased, leased or otherwise incurred as a result of an Insured's <u>Pre-Existing Condition is not covered under this Policy unless such treatment, medical service, surgery, medication, equipment, claim, loss or expense constitutes Covered Expenses incurred by such Insured more than twelve (12) months after the Issue Date, and such treatment, medical service, surgery, medication, equipment, claim, loss or expense are not otherwise limited or excluded by this Policy</u> or any riders, endorsements, or amendments attached to this Policy . . . .

(Rec. Doc. 25-9 at 25)(emphasis added).[1] Finally, the following relevant terms are defined in the policy:

---

[1] In other words, a twelve-month waiting period applies under the policy with respect to coverage for pre-existing conditions, as defined in the policy.

> "Manifests" or "Manifested" means either the presentation of symptoms or the presence of a medical condition, whether physical or mental, and regardless of the cause:
>
> 1. for which medical <u>advice, diagnosis, care or treatment was recommended or received</u>; and/or
> 2. which would have caused a reasonably prudent person to seek medical advice, diagnosis, care or treatment, and which condition <u>would have been medically diagnosable after the receipt of the results of medical diagnostic and laboratory tests that would have been reasonably indicated and ordered by a reasonably prudent Provider under the same or similar circumstances</u>.
>
> . . .
>
> "Pre-existing Condition" means a condition, whether physical or mental, and regardless of the cause:
> 1. for which medical <u>advice, diagnosis, care or treatment was recommended or received during the twelve (12) month period immediately preceding</u> the effective date of coverage under this Policy for the Insured incurring the expense; or
> 2. which <u>Manifested during the twelve (12) month period immediately preceding</u> the effective date of coverage under the Policy for the Insured incurring the expense.

(Rec. Doc. 25-9 at 14, 17)(emphasis added).

The record reflects that Mrs. Rhone presented to Louisiana Dermatology Associates ("Dermatology Associates") on September 20, 2012, complaining of symptoms pertaining to a facial rash with redness and itchiness. (Rec. Doc. 25-2 at 1; 35-1 at 1). As part of a follow-up, she was seen on October 5, 2012, by Kristin Green, a physician's assistant at Dermatology Associates. (Rec.

4

Doc. 25-2 at 2; 35-1 at 1). On that date, Green performed a punch biopsy on the rash, and ordered antinuclear antibody blood testing pursuant to a differential diagnosis of lupus vs. sarcoidosis vs. contact dermatitis. (Rec. Doc. 25-2 at 1; 35-1 at 1). Following return of results on testing of the biopsy, Green concluded the biopsy was consistent with lupus erythematosus. (Rec. Doc. 25-2 at 2; 35-1 at 1). As a result, Green instructed a nurse to call Mrs. Rhone on October 10, 2012, to inform her that the biopsy results were consistent with lupus and that she would need to refer to a rheumatologist. (Rec. Doc. 25-2 at 2; 35-1 at 1). As reflected above, the Rhones later applied for and accepted the Freedom Life policy on November 14, 2012. (Rec. Doc. 25-2 at 2).

On November 27, 2012, after the Rhones accepted their Freedom Life policy, an employee of North Oaks Medical Center called Freedom Life to advise that Mrs. Rhone had been admitted to hospital with a diagnosis of lupus and dyspnea. (Rec. Doc. 25-2). The record reflects that Mrs. Rhone was in hospital from November 24, 2012, to November 28, 2012. (Rec. Doc. 25-2 at 3; 35-1 at 2). She was later re-admitted in December 2012, where she ultimately died due to complications from lupus. (Rec. Doc. 25-2 at 3; 35-1 at 2).

Following submission of a claim by the plaintiff herein relating to expenses of Mrs. Rhone's hospitalizations, Freedom

Life gathered medical records and requested an opinion from Dr. Robert Baird on July 24, 2013, as to what charges, if any, were the result of a Pre-Existing Condition, as defined in the policy. (Rec. Doc. 25-2 at 3). Dr. Baird opined that of the charges incurred from December 7, 2012, until her death on December 24, 2012, Mrs. Rhone's charges were related to the treatment of lupus, except for charges on December 23, 2012, and December 24, 2012, which were related to treatment of a perforated colon. (Rec. Doc. 25-2 at 4; 35-1 at 2). Dr. Baird's opinion was verified by letter of August 12, 2013, to Dr. Michael Drapcho and Dr. Leal. (Rec. Doc. 25-2 at 4); 35-1 at 1). Dr. Leal confirmed that the primary coverage of treatment from December 14, 2012, through December 22, 2012, was for treatment of conditions attributable to lupus, specifically respiratory failure secondary to lupus. (Rec. Doc. 25-2 at 4; 35-1 at 2). The record indicates Freedom Life paid charges attributable to the colon perforation, but denied coverage as to those charges related to treatment for conditions attributable to lupus, to the extent such amounted to a Pre-Existing Condition under the policy. (Rec. Doc. 25-2 at 4; 35-1 at 1).

### III. CONTENTIONS OF MOVANT

Defendants FreedomLife and USHealth move for summary judgment dismissing Plaintiff's claims, arguing no genuine issue of material fact exists that the claims for which coverage was

6

denied were related to an excludable Pre-Existing Condition under the terms of the policy. They further argue that the species of twelve-month exclusion period made applicable under the policy has been specifically upheld under Louisiana law, and that the Court must construe the policy by its terms.

**IV. CONTENTIONS OF OPPONENTS**

Without challenging the validity of the exclusion period, Plaintiff argues deposition testimony of Dr. Sean E. Shannon, the rheumatologist to whom Mrs. Rhone was referred after her initial diagnosis at Louisiana Dermatology Associates, indicates that, on November 9, 2012, he had not yet reached a conclusion as to a diagnosis of systemic lupus, and that possibilities remained that Mrs. Rhone might be suffering from some other and/or additional disease. For reasons explained below, this testimony is insufficient to prevent summary judgment and does not, in any event, support the argument for which Plaintiff cites it.

**V. RULE 56 SUMMARY JUDGMENT STANDARD**

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A genuine issue exists if

the evidence would allow a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F.3d 532, 536 (5th Cir. 1998). The moving party bears the initial responsibility of informing the district court of the basis for its motion. *Celotex*, 477 U.S. at 323. The movant must point to "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56). If and when the movant carries this burden, the nonmovant must then go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[W]here the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. . . . Only when 'there is sufficient evidence

8

favoring the nonmoving party for a jury to return a verdict for that party' is a full trial on the merits warranted." *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616 (5th Cir. 1994). Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

**VI. DISCUSSION**

As noted above, the record clearly reflects that as early as September 20, 2012, Mrs. Rhone sought treatment for a skin rash on her face. By October 10, 2012, at the latest, the fact that biopsy test results consistent with lupus had obtained was communicated to her. The Rhones submitted their application to FreedomLife twenty-one days later, on November 1, 2012, and received a follow-up call on November 5, 2012, during which they confirmed the contents of their application. As part of that application, they were expressly asked, "Has any applicant been diagnosed with, treated or taken medications for, <u>consulted with, had symptoms of, or been advised to seek treatment for any disease or disorder</u>," including specifically lupus, or skin conditions. (Rec. Doc. 25-4 at 3)(emphasis added). They answered in the negative both on the application and during the telephone call, notwithstanding the fact that Mrs. Rhone had consulted a dermatologist complaining of a skin rash, had been advised of a

9

biopsy yielding results consistent with lupus, and been advised to consult a rheumatologist.

The FreedomLife policy the Rhones ultimately accepted included a twelve-month period excluding coverage for any Pre-Existing Conditions which "manifested" during that period. "Manifestation" is defined in the policy as "presentation of symptoms or the presence of a medical condition" for which "medical advice, diagnosis, care or treatment was recommended or received." (Rec. Doc. 25-9 at 14, 17). Mrs. Rhone's symptoms manifested under this definition by virtue of the fact that she sought and received medical advice, care, and treatment, regardless of whether she received a conclusive diagnosis. A Pre-Existing condition is defined as one which "manifested" during the twelve-month period preceding the start of coverage, or as a condition for which "medical advice, diagnosis, care or treatment was recommended or received during the twelve (12) month period immediately preceding." *Id*. While these definitions overlap to a significant degree, there is no question that Mrs. Rhone received medical advice pertaining to lupus during this period and the condition therefore additionally amounted to one defined as "pre-existing" under the policy when it manifested during her subsequent hospitalization.

As the foregoing reveals, regardless of whether Dr. Shannon had reached a conclusive diagnosis of lupus on the date of

November 9, 2012, lupus was a pre-existing condition under the terms of the policy. It must be further noted that the deposition testimony relied upon by Plaintiff merely indicates that Dr. Shannon had not yet reached a conclusion as between cutaneous lupus and systemic lupus. The risk of the latter is the reason Dermatology Associates referred Mrs. Rhone to a rheumatologist in the first place. It does not mean she had not been not been diagnosed with some form of lupus by that point. Because the referral to Dr. Shannon was based upon medical advice indicating the risk that the manifested symptoms of lupus reflected an underlying condition of systemic lupus, systemic lupus amounts to a pre-existing condition under the policy.[2] The fact that Mrs. Rhone ultimately died of complications from systemic lupus mean she died of a pre-existing condition for which coverage was excluded. While the Court is not blind to the personal tragedies inherent in this case, the question of law presented here compels a clear result.

---

[2] See, e.g., (Rec. Doc. 25-12 at pp. 24 – 26, Deposition of Kristin Green, Physician Assistant at Dermatology Associates)("Q. Does this mean that the patient would have been notified of these two test results? A. Correct. . . . Q. She would have been told on October 10th then, that the results indicated that she had lupus? A. Yes."); (*Id.* at pp. 33)("Q. During the course of your interaction with Ms. Rhone, did you ever tell her that she had lupus or did you simply tell her that she might have lupus and she needs further testing? A. No. Whenever we got the results, we told her that the lab work was consistent with it. So for further evaluation, she'd need to see a rheumatologist. Q. And what do you mean by evaluation? A. As in, like, she had something on her skin that was consistent with lupus, but like I said, lupus can occur internally as well. So she needed evaluation by a rheumatologist to make sure that she didn't have other system involvement.")(emphasis added).

It should be noted that Defendants appeared to conflate two legal questions in arguing in favor of summary judgment. They relied on the fact that the policy application, which asked about any prior treatment for or diagnosis of lupus, did not distinguish between cutaneous or systemic lupus and that Mrs. Rhone should therefore have answered the pertinent questionnaire in the affirmative, even if she had merely been diagnosed with cutaneous lupus at that time. In this they are correct, but this issue bears on whether they are entitled to deny coverage under the Applicant Acknowledgments section of the policy, which states: "any fraudulent statement or material misrepresentation on the Application and/or amendments *may* result in claim denial or contract rescission." While it is likely under these facts that the failure to disclose the lupus treatment, diagnosis, etc would have risen to the level of a material misrepresentation, the legality of coverage denial under that provision is a legal issue separate from a determination that lupus was a pre-existing condition under the policy, and Defendants advanced no legal support in favor of that contention. Moreover, the policy merely indicates that coverage "may" be denied in the case of a misrepresentation. The real issue presented was whether under the terms of the twelve-month exclusion for pre-existing conditions, lupus amounted to such a condition, for which Mrs. Rhone ultimately sought coverage. For the reasons stated above,

the answer is yes, whether or not Mrs. Rhone had been diagnosed specifically with "systemic lupus" prior to her policy application, because of the broad definition of "manifested" set forth above. This type of provision has been upheld under applicable Louisiana law, and is to be interpreted according to its plain terms. *See* La. Rev. Stat. ann. § 22:975; *Quam v. La. Hosp. Serv. Inc.*, 517 So.2d 984 (La. App. 3 Cir. 1987)(enforcing 365-day exclusionary period where terms were not ambiguous). Thus, summary judgment must be granted.

## VII. CONCLUSION

Because lupus was a pre-existing condition which manifested during the exclusionary period under the terms of the policy, and because there is no genuine issue of material fact as to the chronology of events herein, **IT IS ORDERED THAT** Defendants' Motion (Rec. Doc. 25) is **GRANTED**, and Plaintiff's claims against FreedomLife and USHealth are **DISMISSED.**

New Orleans, Louisiana, this 22nd day of July, 2015.

_____
UNITED STATES DISTRICT JUDGE

13